* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and oral arguments of the parties. The Full Commission finds that the appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or to rehear the parties or their representatives. Accordingly, the Full Commission affirms with modifications, the Opinion and Award of Deputy *Page 2 
Commissioner Glenn and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. The employer-employee relationship existed between plaintiff and defendant-employer at all relevant times herein.
3. Defendant-employer was an approved self-insured for workers' compensation purposes with North Carolina Baptist Hospital acting as administrator at all relevant times herein.
4. Plaintiff sustained an admittedly compensable injury by accident while in the course and scope of his employment with defendant-employer injuring his neck on February 22, 2006.
5. Plaintiff's average weekly wage is $473.90 per week, yielding a compensation rate of $315.95 per week.
6. Plaintiff has not returned to work since his injury by accident and defendants initially accepted and paid benefits to plaintiff pursuant to a Form 63. Defendants have paid plaintiff benefits since his injury in the amount of $315.95 per week to present. *Page 3 
7. At the hearing before the Deputy Commissioner, the parties submitted records, which were admitted into the record and marked as Stipulations which included the following:
 a. Stipulation #1, plaintiff's medical records;
 b. Stipulation #2, all IC forms;
 c. Stipulation #3, plaintiff's IC Form 33;
 d. Stipulation #4, IC Order dated 11/1/07;
 e. Stipulation #5, plaintiff's personnel records;
8. The following exhibits were admitted into evidence at the hearing before the Deputy Commissioner:
 a. Plaintiff's #1, e-mail from Ms. Lyles to Mr. DeLuca;
 b. Plaintiff's #2, Wake Forest bill;
 c. Plaintiff's #3, cover sheet from Ms. Stovall to Ms. Phillips;
 d. Plaintiff's #4, letter from plaintiff's attorney to Dr. Campos dated 11/20/07;
 e. Defendants' #1, Mr. Steinbeck's resume;
 f. Defendants' #2, plaintiff's application for Cook Medical position;
 g. Defendants' #3, Mr. Enoch's CV;
 h. Defendants' #4-A, private investigators reports, 4-B, video reports and 4-C photographs (8);
 i. Defendants' #5, copy of subpoena;
 j. Defendants' #6, letter from plaintiff's attorney to Mr. DeLuca.
9. The issues to be determined are as follows: *Page 4 
 a. Whether plaintiff has reached maximum medical improvement (MMI); and if so, what is his permanent partial disability rating?
 b. Whether plaintiff's other medical conditions (low back, prostate/bladder, erectile dysfunction and depression) were proximately caused by his injury? If so, what additional medical treatment is reasonable and necessary?
 c. Should plaintiff's compensatory benefits be suspended for refusing suitable employment or sabotaging a potential job offer?
 d. Whether defendants have unreasonably or unjustifiably denied and refused to provide plaintiff with prescribed treatment including, but not limited to YMCA membership as ordered by the Industrial Commission on November 1, 2007 and providing Lexapro as prescribed and the continued treatment of Dr. John Smith?
 f. Whether defendants have engaged in stubborn, unfounded litigiousness that would entitle plaintiff to sanctions and fees?
 * * * * * * * * * * *
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is a 55-year-old with a high school diploma. Plaintiff was last employed as a Laboratory Animal Technician for the Animal Resource Program of Wake Forest University School of Medicine, defendant-employer. He worked in this position for two and a half years before his date of injury. He had previously worked for 21 years at Reynolds Tobacco until the *Page 5 
factory closed.
2. On February 22, 2006, plaintiff sustained an admittedly compensable injury by accident to his cervical spine. While he was cleaning out a monkey's cage plaintiff spilled some of the cleaning solution. He stepped in the spill and his feet flew out from under him. He landed on his head and neck. Alone at the work site, he remained on the floor for approximately one hour because he was unable to move his arms or legs. Eventually, he regained some feeling in his limbs and was able to crawl to a telephone and call his supervisor for help.
3. Plaintiff was transferred by ambulance to the Emergency Department of Wake Forest University Baptist Medical Center. He was sent for an MRI and admitted to the Neurosurgery Intensive Care Unit. Plaintiff continued to experience paresthesias in all four extremities as well as weakness.
4. The following day, Dr. Joseph Alexander examined plaintiff and found radiographic evidence of an acute spinal cord compression. Dr. Alexander noted that plaintiff had a remote history of approximately 12 years ago and 10 years ago of two other almost identical episodes of falls or injuries to his back and neck with episodes of weakness and paralysis, similar to this presentation. However, after those prior incidents, his strength fully returned to normal level. Additionally, Dr. Alexander noted that plaintiff had a past medical history reflecting a diskectomy and cervical C5 and C6 fusion approximately 10-12 years earlier.
5. On February 27, 2006, Dr. Alexander performed a "posterior procedure with decompression extending to C7 and stabilization extending to T1." On March 3, 2006, plaintiff was transferred to the Sticht Center for inpatient rehabilitation. Jennifer Lyles, RN, was assigned as the medical case manager for plaintiff.
6. Upon arrival at the Sticht Center, Dr. Claudia Campos became plaintiff's treating *Page 6 
physician.
7. On March 10, 2006, plaintiff was diagnosed by a psychologist with reactive depression and suggested an anti-depressant medication to treat the condition. Dr. Campos prescribed Lexapro for plaintiff to treat his depression. The prescription was paid for by defendants from March 2006 to approximately March 2008. Plaintiff is still in need of this medication as it has continued to be prescribed by his treating doctors.
8. Dr. Campos diagnosed plaintiff with a neurogenic bladder because of his problems with his inability to void. Dr. Campos referred plaintiff to Dr. Scott MacDiarmid, an urologist, for this problem and for a loss of sensation in the saddle region plaintiff experienced.
9. Dr. MacDiarmid noted that the primary change in the urologic symptoms was a decreased flow or decrease in pressure when he urinates causing plaintiff a mild hesitancy and/or straining. Dr. MacDiaarmid also noted that plaintiff can get a normal erection, but he does not feel any sensation during intercourse. Dr. MacDiarmid concurred with Dr. Campos' diagnosis of a neurogenic bladder.
10. A driving evaluation was done on May 1, 2006, which states that Mr. Phillips was not experiencing any side effects from the medications he was taking at that time. Mr. Phillips has never had another driving evaluation, even though his medical status and prescriptions have changed significantly since May 2006.
11. On May 19, 2006, plaintiff went to the emergency room because he was experiencing hyperesthesia (excessive sensitivity to pain) from his waist, down both legs bilaterally, and to his feet. Additionally, plaintiff's knees had started buckling.
12. Subsequently, an MRI was done, and based upon the results, Dr. Alexander told plaintiff that he needed further C3 decompression surgery and an extension of his fusion to C2. *Page 7 
Dr. Alexander was of the opinion that this should be done as soon as practicable. Plaintiff decided not to have the surgery at that time.
13. Defendants directed plaintiff to see Dr. Larry Davidson for a second surgical opinion. When plaintiff saw Dr. Davidson, Dr. Davidson noted that plaintiff complained of sexual dysfunction as well as the other problems he was having. Dr. Davidson also recommended the surgery and extending plaintiff's fusion up to C1.
14. Plaintiff was also seen by Dr. John Smith, an urologist. Dr. Smith noted that plaintiff had erectile dysfunction characterized by a lack of seminal ejaculate.
15. Dr. Campos felt that plaintiff had reached maximum medical improvement as of October 16, 2006, and after reviewing work restrictions of sedentary / light duty as indicated by a functional capacity exam performed on September 26, 2006, Dr. Campos gave plaintiff a permanent disability rating of "100% of man." After receiving this rating, defendants sent plaintiff back to Dr. Larry Davidson for a second opinion on the disability rating issued by Dr. Campos. Dr. Davidson was in agreement with Dr. Campos.
16. Plaintiff continued to have complaints with his neck and shoulder pain, hypersensitivity in his arms and legs, burning in his lower legs, spasticity in his legs, altered sensation in his hands, and difficulty emptying his bladder. As a result of these ongoing problems he was instructed by Mark Sizemore, PA-C, to maintain a long term conditioning program, such as at a YMCA, indefinitely. Also, he was told that, as far as work, he will need a sedentary job that allows frequent change of position, with no repetitive bending, twisting, or lifting. He would need to give high attention to ergonomics. Defendants approved a six month membership to a YMCA, but the membership expired in approximately June 2007.
17. Plaintiff returned to Dr. Campos on February 6, 2007 with complaints of multiple *Page 8 
falls with his left leg dragging and increasing paresthesias in both legs over the previous month in addition to his other chronic medical problems.
18. Dr. Campos diagnosed plaintiff with C7 tetraplegia and stated that his falls were "secondary to the increased proprioception and weakness in his lower extremities," and Dr. Campos encouraged plaintiff to use his straight cane and to continue his exercises at the YMCA. Dr. Campos also increased plaintiff's medication for spasticity (Baclofen), increased his medication for pain (Lyrica), and added another medication, Ultram, for the neuropathic pain in his lower extremities. Dr. Campos continued plaintiff on Lexapro for depression and anxiety, and referred him to Dr. Jeffrey Feldman, psychologist, for adjusting coping mechanisms and reactive depression.
19. Plaintiff was seen by Dr. Feldman on February 15, 2007. Plaintiff expressed a sense that he was being punished, feeling that the current vocational rehabilitation process is such that he feels he is pushed to apply for different jobs that he is unlikely to get. He stated that it was difficult and painful to go to jobs and be rejected. He indicated that he had a persistent but realistic worry about what he might be able to do vocationally in the future, as well as his financial and health status.
20. Dr. Feldman diagnosed plaintiff with reactive depression and a significant degree of generalized anxiety, without it being characteristic of anxiety disorder, and recommended six psychology treatment sessions. Plaintiff returned to Dr. Feldman on May 31, 2007 at which time he recommended another four psychology sessions at three week intervals. Defendant did not authorize the sessions as recommended by Dr. Feldman, but allowed plaintiff to return to Dr. Feldman once more on July 17, 2007. At that appointment, among other things Dr. Feldman recommended that plaintiff return for psychology appointments every other week for 4 additional *Page 9 
sessions, resume attendance at the YMCA, and obtain a consultation with a professional specializing in treatment of sexual dysfunction secondary to neurological/spinal injury.
21. The medical case manager, Jennifer Lyles, contacted the adjustor, Jim DeLuca, by electronic mail on July 18, 2007 and requested that she be advised as to the authorization of a YMCA membership and continued evaluation with Dr. Feldman. In response, Mr. Deluca stated "[A]t this point a hearing has been filed for. We will not be authorizing any additional treatment."
22. On August 6, 2007, Dr. Campos recommended a psychiatric evaluation and management for plaintiff's depression, as well as additional sessions with Dr. Feldman and the resumption of his YMCA membership. This medical treatment was not authorized or provided by defendants.
23. On April 18, 2007, Mr. Phillips returned to his urologist, Dr. Smith, who found that Mr. Phillips had decreased ability to contract his anal sphincter.
24. Dr. Larry Davidson, a neurologist, was of the opinion that plaintiff's fall caused him to sustain a spinal cord injury and that the treatment that he had been provided was necessary. Dr. Davidson believes that plaintiff will need to be followed so that his condition can be monitored as well as his medications.
25. Dr. Smith opined that plaintiff had a neurogenic bladder or bladder dysfunction and both fecal and urinary incontinence. Dr. Smith was of the opinion that these conditions were a direct result and caused by plaintiff's admittedly compensable injury by accident. Dr. Smith additionally, was of the opinion that these conditions would continue to worsen over time and that plaintiff will need to be seen at least twice per year for the remainder of his life so that his condition can be monitored and the appropriate treatment prescribed. *Page 10 
26. As a result of his injury, when plaintiff attempts to void his bladder he is unable to completely do so and he has to go back to the bathroom a second time to attempt to complete the voiding process. Some of the problems that can be caused by him not being able to completely empty his bladder include kidney stones and infections. Additionally, he has to be monitored so that it can be determined whether the additional pressure that is being created as a result of his condition does not damage his kidneys.
27. Dr. Smith noted that plaintiff was not able to feel the normal pressure that we feel when we need to have a bowel movement, and he cannot determine whether he has to pass gas or have a bowel movement. Dr. Smith opined that this loss of feeling is directly related to his compensable injury by accident. Dr. Smith does not feel that this problem prevents plaintiff from being able to perform some form of light duty work as long as he has access to a bathroom.
28. In August 2007, plaintiff interviewed with Cook Medical/Endoscopy about a possible job, during which plaintiff used his cane. Thereafter, plaintiff was given a tour of the plant and on October 29, 2007 plaintiff was offered a job by Mr. Atkins. Plaintiff told Mr. Atkins that he needed to talk with his doctor and attorney to make sure that the job was within his restrictions.
29. Plaintiff contacted Mr. Steinbeck, his vocation rehabilitation counselor, and informed him of the offer. Thereafter, Mr. Steinbeck contacted Cook Medical in an effort to get a job description and to perform a job analysis. Mr. Steinbeck got the information that he needed and determined that the job would not violate plaintiff's lifting restrictions but that it was for a ten hour per day position and that was beyond the restrictions that had been set out in the FCE.
30. Plaintiff's attorney thereafter contacted Dr. Campos to determine whether this was a position that plaintiff could perform. Before a response was received the job was filled *Page 11 
and was no longer available.
31. In March 2008, Mr. Steinbeck also located an opening for a courier position which was also offered to plaintiff and within his restrictions. Because the position appeared to be a part-time job and Mr. Steinbeck's primary goal was to secure full-time employment for plaintiff, Mr. Steinbeck did not pursue the issue further. The position was within plaintiff's restrictions and matched some of his prior work experience. Shortly thereafter, defendants advised Mr. Steinbeck to place his rehabilitation services on hold because they had received a calendar setting the case for hearing the following month.
32. On September 16, 2009, plaintiff underwent an independent medical evaluation by Dr. Del Curling of Winston Neurological and Spinal Surgery Associates, who was mutually agreed upon by both parties. Dr. Curling did not feel that any further diagnostic studies were needed at this time. Dr. Curling concurred with plaintiff's other providers that plaintiff is a candidate for further surgical decompression at C2/3. However, as plaintiff has elected not to proceed with the surgical recommendations and his condition is not progressive, no other therapeutic modalities are indicated, and it is appropriate to consider plaintiff to be at maximum medical improvement.
33. Based upon the North Carolina Industrial Commission Rating Guide, Dr. Curling assigned plaintiff a 50% permanent partial impairment rating to his back which encompasses all signs and symptoms associated with the cervical injury, including neck pain, sensorimotor disturbance in the extremities, and neurogenic bowel/bladder, all of which are manifestations of the cervical cord injury.
34. Dr. Curling noted that while the Industrial Commission rating guidelines allow for a 100% rating to the whole person, as assigned by Dr. Campos, plaintiff is not a quadriplegic but *Page 12 
is rather a quadriparetic, which does not warrant a 100% rating. Dr. Curling noted that a quadriplegic with 100% impairment would be on a ventilator and have no voluntary use of any bodily functions.
35. Dr. Curling concurred with the sedentary-light duty restrictions as recommended in the September 2006 FCE.
36. The Full Commission finds based upon the greater weight of the evidence that plaintiff has 50% permanent partial impairment to his back.
37. On November 4, 2009, defendants took the deposition of Anthony Enoch, a rehabilitation counselor from East Carolina University. Mr. Enoch reviewed plaintiff's work history and various other materials relating to Plaintiff's file and is of the opinion that plaintiff is employable. In Mr. Enoch's opinion, there were jobs available in plaintiff's relevant job market both in 2007 and in 2009, which he could perform without any additional training. However, with additional training, there would be additional jobs that he could perform within his restrictions.
38. Plaintiff owns and cares for six horses. In addition, he cares for a seventh horse, owned by another person in exchange for the use of her horse trailer. He has also made several long trips to horse shows. One was in Arden, North Carolina, approximately 200 miles away. A photograph shows he has kicked a young stud colt in the belly to get its attention, and elevated his foot to the approximate waist level in order to do so.
39. Plaintiff is capable of doing chores and working around the home. He was one of the primary caregivers for his mother during the months leading up to her death on November 22, 2007. Plaintiff admitted to gardening and testified that his physical therapist had been to his *Page 13 
garden to talk about some of the things he did. He is able to bathe, take care of himself personally, clean the house on occasion, and rake the horse corral.
40. Plaintiff has also been observed loading a horse bench, weighing forty-seven (47) pounds, into his truck. He has also unloaded fifty (50) pound bags of horse feed from his truck.
41. Plaintiff's testimony regarding his abilities is inconsistent with the information that he has been giving to his medical providers and with the greater weight of the evidence. On June 1, 2007, plaintiff met with Mr. Steinbeck at Bojangles and was using a cane. Twenty minutes after the meeting, plaintiff washed out a horse trough. When he finished, he walked without his cane and led several horses in the pasture by his house. Later that day, he drove to a hardware store and left with a large, flat cardboard box using a dolly. He then pushed the dolly to the back of his pickup truck and lifted the 5 foot by 2.5 foot box in the back of his truck. The box contained a decorative horse office table or bench. He was not using a cane during any of this activity.
42. On November 8, 2007, the surveillance showed plaintiff feeding his horses and visiting the Farm Bureau Office without a cane. On the same day, plaintiff met Mr. Steinbeck with his cane and walked with a limp. After the meeting, plaintiff did not use the cane and did not walk with a limp, as he continued to shop in East Bend. Dr. Campos testified that there was no medical reason plaintiff would need a cane while meeting with Steinbeck, but then not need to use it for other daily activities. Plaintiff was offered the job at Cook Medical despite bringing a cane to the interview. Mr. Enoch opined that using a cane only for interviews and not for other daily activities would be, in his opinion, an attempt to sabotage the job interview.
43. The Full Commission finds that plaintiff is employable, taking into account his age, education, past employment history, and work restrictions. The Commission finds that the *Page 14 
plaintiff is employable and is capable of some work even if he were in the sedentary-light position as documented by the FCE.
44. The Full Commission finds based upon the greater weight of the evidence that plaintiff has not put forth a reasonable effort to obtain employment.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of plaintiff's compensable injury, plaintiff is entitled to a 50% permanent partial disability rating to his back. N.C. Gen. Stat. § 97-31. Therefore, plaintiff is entitled to 150 weeks of permanent partial disability at the rate of $315.95 per week totaling $47,392.50. Id.
2. Plaintiff is entitled to receive medical treatment for his compensable injury that is reasonably necessary to effect a cure or provide relief or lessen the period of disability to be paid for by defendants. N.C. Gen. Stat. § 97-25. If a physical injury precipitates a psychological disorder such as depression, the disability caused by the psychological disorder and the treatment required for it is still compensable. Hill v. Hanes Corp.,319 N.C. 167, 353 S.E.2d 392, 396-97 (1987). Based upon the greater weight of the evidence, plaintiff's reactive depression is causally related his compensable injury to his cervical spine. Id.
Defendants must authorize the prescription medications that Dr. Campos prescribed for treatment of Mr. Phillips' reactive depression. Id.
3. Plaintiff's prostate/bladder/bowel and erectile dysfunction are a direct result of his admittedly compensable injury by accident and the medical expenses for the treatment of the *Page 15 
same should be paid for by defendants. N.C. Gen. Stat. § 97-25.
4. Plaintiff has the burden of proving disability, defined as a loss of wage earning capacity. Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v.Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). Plaintiff may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than her pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, supra. Based upon the greater weight of the evidence, plaintiff has failed to prove that he is totally disabled from employment. Id.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission enters the following:
 ORDER
1. Defendants shall pay to plaintiff a 50% permanent partial disability rating to his back for 150 weeks at the rate of $315.95 per week totaling $47,392.50.
2. Defendants shall pay for Plaintiff's medical treatment for his compensable injury *Page 16 
that is reasonably necessary to effect a cure or provide relief or lessen the period of disability. This includes medical treatment for plaintiff's prostate/bladder/bowel and erectile dysfunction which are a direct result of his admittedly compensable injury by accident.
3. Defendants shall pay for treatment of plaintiff's depression which is causally related to his compensable injury.
4. Defendants shall pay the cost of this matter.
This the 28th day of April 2010.
 S/__________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/__________ DIANNE C. SELLERS COMMISSIONER
 S/__________ LAURA KRANIFELD MAVRETIC COMMISSIONER